FILED
1998 NOV 10 AM 10: 34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL LEAVITT, | ] |
| Plaintiff, | ] |
| vs. | ] CV 97-N-2063-S |
| THE WATER WORKS AND SEWER BOARD OF THE CITY OF BIRMINGHAM, | ] |
| Defendant. | ] |

ENTERED
NOV 10 1998

## Memorandum of Opinion

In this reverse race discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended (hereinafter "Title VII") and 42 U.S.C. § 1981, plaintiff Michael Leavitt alleges that the defendant Water Works and Sewer Board of the City of Birmingham (hereinafter "Water Works") passed him over for promotions while he worked at the Water Works in favor of less qualified African Americans.[1] Specifically, Leavitt complains that the Water Works failed to promote him to the positions of Supervisor, Service Representatives, on February 6, 1995 (Russell Strickland, a black male, was promoted to the position); District Supervisor on February 5, 1996 (Randolph Towns, a black male, was promoted to the position); and Sequence Planner on December 11, 1995 (Roosevelt Bell, Jr., a black male, was hired into the position). Any

---

[1] In his original complaint, Leavitt made additional claims pursuant to 42 U.S.C. § 1983 and the laws of the State of Alabama. Those claims were dismissed by order of this court on February 10, 1998.

other failure to promote claims Leavitt alleged in his complaint are barred by the applicable statutes of limitations.[2]

The matter is presently before the court on a motion for summary judgment filed by the Water Works on June 29, 1998. The motion has been fully briefed and was submitted at the court's regularly scheduled motion docket on Thursday, October 29, 1998. Upon due consideration, defendant's motion for summary judgment will be granted in part and denied in part.

I.      **Statement of Facts.**[3]

Plaintiff Michael Leavitt, a white male, began working for the Water Works and Sewer Board of the City of Birmingham (hereinafter "Water Works") in September of 1979. *Leavitt Depo.* at 30. He received an Associate's degree in Arts and an Associate's degree in science from Jefferson State Junior College in 1979, and a Bachelor's degree in Business Administration from Faulkner University in 1994, which he received through Water Works'

---

[2] *See* the Memorandum of Opinion entered by this court on February 10, 1998.

[3] In developing the statement of facts in this opinion, the court considered those facts claimed to be undisputed by the parties, the parties' respective responses to those claims, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied*, *USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

In reaction to needlessly contentious and outlandishly verbose summary judgment submissions, the court has recently heard a suggestion that it adopt and utilize a sanctions system under which the court would impose against the offending lawyer a nondiscretionary penalty of $5 for each "disputed" fact that is clearly undisputed (or not supported by a citation to the record) and "undisputed" fact about which there clearly is a genuine dispute, $500 for each frivolous claim, defense or summary judgment motion, and other progressive penalties. The court notes that the factual submissions in this case, particularly the defendant's, as well as the defendant's motion to strike portions of the responsive submission, have done much to increase the appeal of such a system. Apparently, these lawyers, as well as many others, have forgotten that they have dual duties. Their duty to represent their clients vigorously is constrained by an equally important duty of candor to the court. When lawyers play the "litigation game" they increase costs to their clients, impose unjust costs on opposing parties, and impermissibly and selfishly consume precious judicial resources that should be devoted to the causes of other litigants, whose lawyers take their duties to the court more earnestly.

2

tuition reimbursement program. *Id.* at 29-30, 111-12. Leavitt began his employment at the Water Works as a "B Laborer," became an "A Laborer" after approximately two months, was promoted to "B Utility" a few months later, and became a "Distribution Aid II" two or three years later. *Leavitt Depo.* at 46-49. After serving in that position for eight to ten years and performing land surveys, leak surveys, and line location, Leavitt was promoted to the position of "Construction Inspector" in May of 1993. As a Construction Inspector, Leavitt supervised contractors, issued material, kept up with work sheets, located valves, chlorinated and flushed lines, ran OCD pumps, obtained permits, did accounting inventory, read construction drawings, and made field and engineering changes. *Leavitt Depo.* at 50-53. He remained in that position until he resigned from the Water Works on September 26, 1996. Throughout his employment at the Water Works, Leavitt worked in the Distribution Department. *Id.* at 46-52, 106.

Pursuant to a written personnel policy, the Water Works officially "endeavor[s] to hire from within." *Mims Depo.* at 74. While the Water Works posts and takes bids for any labor-type positions or positions in which employees are paid hourly, salaried positions are generally filled from available candidates through an informal process. *Freeman Depo.* at 43-44; *Hanson Depo.* at 48. It is undisputed that two of the three positions that are the subject of this controversy—the Supervisor, Service Representatives and Sequence Planner positions—were filled without being advertised or posted for bidding. *Leavitt Affidavit.*

Russell Strickland, a black male, began his employment with the Water Works in February of 1979. *Def. Exh.* 21. In 1990, Strickland was placed in an entry-level job in the Service Department as a Meter Reader, from which he was eventually promoted to Service

3

Representative. *Def. Exhs.* 13, 21. He was promoted to the position of Supervisor, Service Representatives, in February of 1995. *Def. Exh.* 13. That position falls within the Service Department. *Hanson Depo.* at 44. Randolph Harmon, a black male and Manager of Service, was responsible for recommending individuals for promotion to Supervisor in the Service Department. *Freeman Depo.* at 45. The plaintiff has never worked in the Service Department; as noted earlier, he worked in the Distribution Department throughout his employment at the Water Works. *Leavitt Depo.* at 46-52, 106. The Plaintiff's second line supervisor, James Freeman, a white male, testified that Leavitt "had no experience in the Service Department, whatsoever." *Freeman Depo.* at 45. Freeman and the General Manager, Gene Hanson, also a white male, testified that the Plaintiff was not qualified for the position of Supervisor, Service Representatives. *Id.* at 45-46; *Hanson Depo.* at 44, 47. Freeman, Hanson, and plaintiff's immediate supervisor, Dwight Howell, who is also a white male, all testified and agreed that if the plaintiff had been promoted to the Supervisor, Service Representatives position, he would have been supervising employees in the performance of jobs that he knew virtually nothing about. *Freeman Depo.* at 45-46; *Hanson Depo.* at 44, 47; *Howell Depo.* at 25-26. Strickland, on the other hand, held for several years the actual positions that his subordinates would hold. *Def. Exhs.* 21, 22. Leavitt testified that he had performed some of the duties associated with the position of Service Representative while working as a Construction Inspector. *Leavitt Depo.* at 106-07. James Arnold, a construction foreman at the Water Board, testified that he is familiar with the position known as "Service Department Supervisor" and the respective qualifications of Leavitt and

4

Strickland in January 1995, and that, in his opinion, Leavitt was more qualified for the position than Strickland. *Arnold Depo.* at 50-53.

Roosevelt Bell, Jr., a black male, was hired by the Water Works in late 1995 to fill the Sequence Planner position.[4] *Def. Exh.* 14. Bell received a Bachelor of Science Degree in Engineering from the University of Alabama and had approximately 30 years of experience as an engineer at the time he was hired. *Def. Exh.* 19. It appears that Ron Mims, then the General Manager, asked Chuck Allen, the Manager of Human Resources, to find a job for Bell because, as Mims stated, "There is not a lot of engineers; there is not a lot of black engineers in Birmingham. And if we could pick up him, I thought that was a good catch." *Allen Depo.* at 28; *Mims Depo.* at 69-70. Allen then contacted Joel Rhaly, the Division Manager of Quality Control, and together they modified the job description for Sequence Planner[5] to fit Bell's qualifications by emphasizing the engineering requirements and deemphasizing knowledge of the water system. *Allen Depo.* at 28-34. For that reason, perhaps, the parties are in sharp disagreement over whether Bell had the requisite knowledge of chemistry, the Birmingham water works system, and water systems in general, as well as whether Leavitt had the appropriate engineering background and experience with the water works system. *Hanson Depo.* at 38-40, 43, 50-51; *Leavitt Depo.* at 50-53, *Allen Depo.* at 32-34, 36.

---

[4] The parties alternatively refer to this position as "Flushing Coordinator," "Sequence Planner," and "Water Quality Operations Planner," and actually devote time in their submissions disputing the point. The court sees no material relevance to this dispute, and will refer to the position in this memorandum of opinion as "Sequence Planner."

[5] It appears from the testimony that the Sequence Planner position was in the process of being defined at the time Bell was hired; i.e., no one had held the position prior to Bell.

Randolph Towns, a black male, has been employed with the Water Works since 1975. *Def. Exh.* 23. He has a high school diploma. March 1, 1996, he was promoted from Construction Inspector to District Supervisor. *Pla. Exh.* 16. Plaintiff's immediate supervisor testified that Towns was more qualified than the plaintiff for the District Supervisor's position because he had actually performed the jobs of the employees that he would supervise. *Howell Depo.* at 46-47, 50-52; *Def. Exh.* 23. According to Howell, Towns had an advantage over the plaintiff for the position because of his "hands on" experience doing repairs in his position prior to becoming a Construction Inspector; Leavitt, on the other hand, was never in the maintenance department. *Id.* at 51. James Arnold, a construction foreman at the Water Board, testified that he felt race was a factor in promoting Towns from Construction Inspector to District Supervisor. *Arnold Depo.* at 13-18. Both Towns and Leavitt were Construction Inspectors; on their annual evaluations for the period of October 1, 1994 to September 30, 1995, Leavitt received a score of 3.80 while Towns received a 3.75. *Pla. Exhs.* 14, 17. It is undisputed that the District Supervisor's position is an outdoor, skilled labor job; the educational requirements for the aforementioned position are a high school diploma or equivalent experience and training. *Def. Exh.* 24.

## II.  Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving

7

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-

8

movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.   Discussion.

A plaintiff who alleges disparate treatment based on race under Title VII or § 1981 must prove that the defendant acted with a discriminatory purpose. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). A plaintiff can create a rebuttable presumption of discriminatory intent by establishing a prima facie case, *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989), and may establish a prima facie case in one of three ways: (1) by presenting direct evidence of discriminatory intent; (2) by meeting the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) by demonstrating through statistics a pattern of discrimination. *See Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582. In the present case, Leavitt has presented no direct or statistical evidence of discrimination by the defendant. Therefore, he must establish a prima facie case of discrimination, if at all, through circumstantial evidence.

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie

9

case of discrimination.[6] "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring it to articulate some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. *Id.* "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987), *cert. denied*, 502 U.S. 1058 (1992).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine,* 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804. In the Eleventh Circuit, summary judgment for the defendant is inappropriate once a plaintiff has established a prima facie case and there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged actions. *Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir. 1997); *Howard v. BP Oil Co.,* 32 F.3d 520 (11th Cir. 1994).

---

[6] Under this test, the elements of a prima facie case may be modified to fit the circumstances. "The *McDonnell Douglas–Burdine* proof structure 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 594 (11th Cir. 1987) (quoting *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715 (1983).

To establish a prima facie case of failure to promote under the *McDonnell Douglas* framework, plaintiff must show that: (1) he is a member of a protected group; (2) he was qualified for and applied for the promotion; (3) he was rejected in spite of his qualifications; and (4) the individual who received the promotion is not a member of the protected group and had lesser or equal qualifications. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635 (11th Cir. 1998).

As an initial matter, the court notes that there is some dispute as to whether Leavitt actually "applied for" the three promotions in question as required to make out a prima facie case of discriminatory failure to promote. It appears from the evidence that Leavitt interviewed for one of the positions, and the parties do not dispute that all of the positions in question were not advertised and were filled on an informal basis. To satisfy this element of a prima facie case, Leavitt need not demonstrate that he formally applied for the positions in light of the informal, unpublicized selection process used to fill the positions. *See Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793 (11th Cir. 1988); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir. 1984). The plaintiff thus satisfies this prong of the prima facie case with regard to all three positions.

With regard to the position of Supervisor, Service Representatives, Leavitt cannot state a prima facie case of discrimination because the undisputed evidence demonstrates that the position was filled by a member of the unprotected class with far greater qualifications. Although Leavitt possessed a Bachelor's degree and presented evidence that James Arnold, the Construction Foreman, thought he was more qualified for the position, Russell Strickland had greater seniority, more experience in the positions he would be

11

supervising, greater familiarity with the work involved in the Supervisor, Service Representatives, position and several years of tenure in the Service Department. The plaintiff had never worked in the Service Department. The evidence offered by the plaintiff fails to suggest the existence of a disputed material fact as to whether he was more qualified—or even equally qualified—for the Supervisor, Service Representatives, position.

To the contrary, Leavitt has alleged a prima facie case with regard to the positions of Sequence Planner and District Supervisor. It is obvious that the parties dispute what qualifications are required for the position of Sequence Planner. Although Bell had an engineering degree from Alabama and significant experience as an engineer, Leavitt clearly has much more experience with the Birmingham water works system and water systems in general. This is sufficient to raise a question of material fact as to whether Leavitt was more qualified than or equally qualified as Bell for the position of Sequence Planner, especially in light of the testimony establishing that the job description was tailored to emphasize Roosevelt Bell's qualifications. Similarly, plaintiff's qualifications vis-à-vis Randolph Towns' qualifications for the District Supervisor position are subject to legitimate dispute. While some witnesses testified that Towns had more "hands-on" experience and more familiarity with the position, the undisputed evidence shows that Towns had a high school diploma while Leavitt had both an Associate's degree and a Bachelor's degree, and that Leavitt received higher job performance ratings for the year immediately preceding the promotion. Again, this is sufficient to create a genuine issue of material fact as to whether Leavitt was at least as qualified as Bell for the District Supervisor. Finally, with regard to both positions, there is contrary opinion testimony as to each candidate's qualifications for

the positions. Therefore, Leavitt has stated a prima facie case for failure to promote him to the positions of Sequence Planner and District Supervisor.

Since Leavitt has made out a prima facie case, under *McDonnell Douglas* the burden of production shifts to the Water Works to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment actions. *Burdine*, 450 U.S. at 254. The defendants offer two legitimate, nondiscriminatory reasons for promoting Bell and Towns over Leavitt: (1) Bell and Towns were more qualified for the respective positions than the plaintiff; and (2) Leavitt has demonstrated personal racial animosity toward African Americans during his employment at the Water Works, which reflects poorly on his discretion and judgment. The relative qualifications of Bell, Towns, and Leavitt have been discussed above.

With regard to the defendant's allegations of Leavitt's racial hostility, plaintiff's former supervisor, Paul Holt, testified that Leavitt used the word "nigger" to refer to fellow employees, called one employee who received a promotion a "stupid nigger," and made derogatory statements about African Americans that indicated racial prejudice. *Holt Depo.* at 17-18. Gene Hanson also testified that Leavitt made demeaning or derogatory remarks about a black employee. *Hanson Depo.* at 20-21. Defendants completely fail to allege, however, that those who made the decisions with regard to the Sequence Planner and District Supervisor positions knew or believed that Leavitt harbored racial hostility toward blacks. Ron Mims, a former General Manager who appears to have made the primary decision to hire Roosevelt Bell into the Sequence Planner position, actually testified in deposition that he could not make a determination whether plaintiff was a racist and that no one had ever complained to him that Leavitt was a racist. *Mims Depo.* at 47. Defendants

13

have offered no evidence as to who made the hiring decision with regard to the District Supervisor. Under these circumstances, the testimony of Holt and Hansen have no relevance to the hiring decisions in question and defendants have failed to meet their burden of articulating that Leavitt's racial hostility was a legitimate, nondiscriminatory reason for failing to promote him.

As noted earlier, once the defendant has articulated a legitimate, nondiscriminatory reason for its actions, the plaintiff may survive summary judgment by showing that there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged actions. *Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir. 1997); *Howard v. BP Oil Co.,* 32 F.3d 520 (11th Cir. 1994). Leavitt has demonstrated the existence of a genuine issue of fact as to the defendant's assertion that both Bell and Towns possessed qualifications that were superior to Leavitt's for the positions of Sequence Planner and District Supervisor, respectively. As detailed above, Bell had an engineering degree from Alabama and significant experience as an engineer but Leavitt had much more experience with the Birmingham water works system and water systems in general. And, while some witnesses testified that Towns had more "hands-on" experience and more familiarity with the District Supervisor position, the undisputed evidence shows that Towns had a high school diploma while Leavitt had both an Associate's degree and a Bachelor's degree, and that Leavitt received higher job performance ratings for the year immediately preceding the promotion. Through submission of this evidence, plaintiff has met his burden of "designat[ing] specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (quoting Fed. R.

14

Civ. P. 56(e)). Summary judgment on plaintiff's claims regarding the positions of Sequence Planner and District Supervisor is therefore inappropriate.

**IV.   Conclusion**

For the foregoing reasons, defendant's motion for summary judgment will be granted in part and denied in part. A separate order, consistent with this opinion, will be entered.

Done, this ___9th___ of November, 1998.

*[signature]*
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE